## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| UNIVERSITY GENERAL HEALTH | § | **Chapter 11** |
| SYSTEM, INC., et al., | § | |
| | § | **Case No. 15-31086** |
| Debtors.[1] | § | |
| | § | **Joint Administration Pending** |

## DECLARATION OF EDWARD T. LABORDE, JR. IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Edward T. Laborde, Jr., being duly sworn, depose and say:

1.      I am a Director and the General Counsel and Secretary of University

General Health System, Inc. ("UGHS"), a publicly-held corporation organized under the laws of

the state of Nevada and the ultimate parent of the other debtors and debtors-in-possession in the

above-captioned cases (and together with UGHS, the "Debtors," and the Debtors together with

their non-debtor subsidiaries and affiliates, the "Company"). To minimize any disruption to the

Debtors' business and ensure a smooth transition into chapter 11, the Debtors intend to request

various types of relief in "first day" applications and motions (collectively, the "First Day

Pleadings") in connection with these chapter 11 cases (the "Chapter 11 Cases").[2] I submit this

declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title

---

[1]     The Debtors, their respective case numbers, and the last four digits of their respective taxpayer identification numbers are as follows: University General Health System, Inc. (2436), UGHS Autimis Billing, Inc. (3352), UGHS Autimis Coding, Inc. (3425), UGHS ER Services, Inc. (6646), UGHS Hospitals, Inc. (3583), UGHS Management Services, Inc. (4100), UGHS Support Services, Inc. (3511), University General Hospital, LP (7964), and University Hospital Systems, LLP (3778).

[2]     Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings. I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2.      I have held my current position of General Counsel and Secretary of UGHS since I joined UGHS in January of  2011. I have also been a Director of UGHS since that time. I have extensive experience practicing corporate, securities, and finance law. Prior to joining UGHS, I was a Shareholder in the Corporate Securities Practice Group of the Houston office of Winstead PC. Prior to that time, I was an Associate and then a Shareholder in the Corporate Securities Practice Group of Chamberlain Hrdlicka White William & Aughtry. I have experience in healthcare real estate development projects, including acting as outside counsel to the developers of the Debtors' University General Hospital, an acute care hospital located in Houston, Texas. I received my B.A. from Georgetown University and my J.D. from Tulane Law School.

3.      Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions. In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

4.      This Declaration is divided into two parts. Part I provides background information about the Debtors, their business operations, their corporate and capital structures,

2

4820120v2

and the circumstances surrounding the commencement of the Chapter 11 Cases. Part II sets forth

the relevant facts in support of each of the First Day Pleadings.

## PART I

## BACKGROUND

**B.     The Chapter 11 Filings**

5.     On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors

continue to manage and operate their business as debtors in possession pursuant to Bankruptcy

Code sections 1107 and 1108

**C.     The Debtors' Formation**

6.     In 2005, Dr. Hassan Chahadeh and other partners formed University

Hospital Systems, LLP for the purpose of establishing University General Hospital.  On October

2, 2006, University General Hospital opened its newly constructed 72 bed, general acute care

hospital in the heart of the Texas Medical Center at 7501 Fannin Street. With 6 operating rooms,

one heart catheterization lab, one endovascular/heart catheterization lab, an endoscopy suite and

a comprehensive diagnostic imaging center with state of the art equipment, University General

Hospital prides itself on a physician friendly focus while offering patients individualized,

"concierge" service in contrast to more institutionally driven patient-care services offered by its

larger competitors.

7.     Based upon his experience with physician-owned surgery centers, Dr.

Chahadeh developed University General Hospital to bring together primary care and specialist

physician partners in a for-profit, general acute care hospital. Under the Stark Law, 42 U.S.C. §

1395nn, as it existed at the time, primary care physicians were allowed to own general acute care

hospitals along with specialist physicians, an option that is proscribed for surgery and specialty hospitals.

       8.     Under this business model, University General Hospital differentiates itself from its competitors in the following ways: (1) all-inclusive physician ownership model unites specialists with existing and prospective referral sources, (2) multi-specialty care promotes comprehensive patient care options as opposed to a selective patient care model to "cherry pick" high reimbursement rate procedures, and (3) the physician-owned, "for-profit" structure embraces and emphasizes physician involvement which, in turn, enhances patient care, results in more efficient operations, and reduces administrative bureaucracies while still offering "in-network" services and participation in federally funded insurance programs such as Medicare.

Early Struggles

       9.     University General Hospital faced early struggles from 2006 until 2009. After opening, the hospital had difficulty obtaining "in network" payor contracts due to the failure of an earlier physician-owned hospital in the area. It was able to obtain its first managed care contract with Aetna, but the contract had highly unfavorable terms. University General Hospital faced other operational challenges as it began operations. The impacts of Hurricane Ike and the 2008 financial crisis put enormous strains on operations and liquidity.

       10.    Facing these headwinds, University General moved to address these challenges. In 2007, University General replaced its high cost operational support services provider with new company, Sybaris Group, LLC, formed, in part, by certain partners of University Hospital Systems, LLP, to offer lower cost, "cost plus" services. Over the course of 2009, University General negotiated more favorable managed care contracts with Blue Cross Blue Shield of Texas and Cigna, terminated unfavorable "lease network" contracts, expanded its

4

medical business (including by expanding hospitalist services and adding a critical care unit at the hospital that did not rely on surgical admissions), and improved its revenue cycle infrastructure by creating its Autimis business unit.[3]

<u>The 2011 Restructuring and the Creation of an Integrated Health Delivery System</u>

11.    After making operational improvements and restructuring the company's debt obligations, in January 2011, University General Hospital, LP raised $11 million in new equity capital from "friends and family" in a private placement to fund a restructuring plan. Two months later, in March 2011, University General went public by acquiring 92% of Sea Bridge Freight Corp. ("<u>Sea Bridge</u>"). In this transaction, the partners of University General Hospital, LP and University Hospital Systems, LLP exchanged their ownership interests for the newly issued shares of Sea Bridge through a reverse merger. Sea Bridge changed its name to University General Health System, Inc. ("<u>UGHS</u>"), and UGHS became the ultimate owner of University General Hospital, LP. UGHS also formed four subsidiaries (UGH Hospitals, Inc., UGHS Ancillary Services, Inc., UGHS Real Estate, Inc., and UGHS Management Services, Inc.) to enable the Company to expand its business beyond a single hospital into a robust health delivery system.

12.    In 2011, the Company also acquired (1) the TrinityCare senior living business in exchange for a combination of UGHS common stock, cash and subordinated seller notes, (2) the Autimis business unit in exchange for UGHS common stock and assumption of liabilities, and (3) Sybaris Group, LLC business unit (now known as Sybaris Group, Inc.) for UGHS common stock.

---

[3]    The Autimis unit provides, among other things, billing and coding services for the Debtors and third party healthcare operators.

5

13.     In the beginning of 2012, the Company was well positioned to realize its vision of a physician-centric, integrated, health delivery system. Throughout 2012, the Company further expanded its health delivery system by establishing a number of free standing, surgery centers, physical therapy centers, and sleep labs, and incorporate them as free standing Houston-area hospital outpatient departments ("HOPDs"). The purchase price for these acquisitions included cash, seller notes and assumption of certain debt and lease obligations associated with the operation of the centers. Also, as part of these transactions, University General Hospital, LP entered into management service agreements with the former physician owners of the acquired centers. These former owners continued to provide administrative services for these centers as they had done prior to the acquisition. The physicians would thus become part of the hospital governance structure and become part of the UGHS network of physicians.

14.     The company's former chief financial officer, Mike Griffin, conducted an analysis of the business metrics of each of the transactions and made key assumptions, such as post-closing utilization and reimbursement rates and expense structures. The utilization and reimbursement rates were overestimated and, as a result, the Company did not meet expectations following the acquisitions. Mr. Griffin overestimated the financial outcomes. The combination of lower-than-expected revenues and higher-than-expected costs created substantial operational losses at the nine acquired HOPDs.

Midcap Financing

15.     In September 2012, UGHS entered into a $19 million senior secured facility with MidCap Financial to refinance its credit facility with Amegy Bank and retire other debt obligations, including obligations owed to Regions Bank and the IRS. The MidCap facility is secured by the Company's accounts receivable, certain equipment, and other assets.

6

<u>Profitability and Financial Struggles</u>

16.     For fiscal year 2012 the Company generated revenue of $113 million and EBITDA of $28.3 million.

17.     In December 2012, based upon the recommendations of the New York investment community and Mike Griffin, the Company replaced its auditor Moss Krusik with Crowe Horwath. Crowe Horwath's fees greatly exceeded its original fee estimate and the new auditor was unable to complete the audit in a timely fashion. Moss Krusik was re-hired and completed the audit six months later. This audit delay and the Company's resulting inability to file current financial statements negatively impacted investor confidence in senior UGHS management, thus further impairing the Company's ability to raise capital or refinance debt.

<u>Acquisition of the Dallas Hospital</u>

18.     In December 2012, the same month as Crowe Horwath was hired as auditor, UGHS acquired South Hampton Community Hospital in Dallas. The Dallas hospital was owned and operated by a corporation named Dufek Massif Hospital Corporation ("<u>Dufek</u>"). First National Bank of Edinburg ("<u>FNB</u>") had organized Dufek in 2011 to own South Hampton Community Hospital after it had foreclosed on the previous operator.

19.     The purchase price for Dufek was $30 million note consisting of a $1.5 million down payment and a $28.5 million loan from FNB (the "<u>Dallas Loan</u>"). The Dallas Loan bore a 4.25% annual interest rate and was payable on a 20-year amortization schedule with a 10-year maturity. The Dallas Loan was secured by a deed of trust on Dufek's real estate assets and by liens on certain personal property. UGHS executed a corporate guaranty of the Dallas Loan. UGHS Hospitals, Inc. formed a new subsidiary named UGHS Dallas Hospitals, Inc. to acquire Dufek.

7

20.     In late 2013, the U.S Federal Deposit Insurance Corporation ("FDIC") closed FNB. Subsequently, Dallas-based Plains Capital Bank ("PNB") acquired the Dallas Loan.

<u>Operational Losses in Dallas</u>

21.     UGHS management completed the Dallas acquisition based on the following important assumptions provided by Mr. Griffin: (i) cases and census (which was low during 2012) could be maintained post-closing, (ii) better revenue cycle processes implemented by the Autimis business unit would increase collections and overall liquidity by 20%, and (iii) the existing medical staff represented a stable base of physicians on which to increase physician participation in the hospital's business. All of these assumptions proved to be wrong. The Dallas hospital sustained operating losses averaging more than $1 million per month after the acquisition. The Company believes it may have certain indemnification rights and other claims against a number of parties with respect to the acquisition of the Dallas hospital.

22.     The Dallas losses also contributed to cash shortfalls of the Autimis and Sybaris business units, as Dufek failed to pay these units an aggregate of approximately $3.9 million for services rendered. UGHS was forced to fund the operational losses generated from the Dallas hospital as well as Autimis and Sybaris. This significantly eroded University General's 2013 positive cash flow.

<u>Execution of United Contract in February 2014</u>

23.     University General had been "out of network" with United Healthcare since opening in 2006. In the last half of 2013, UGHS experienced declining reimbursements due, in part, to changes in out-of-network reimbursement methodologies imposed by UHC both as a matter of policy and the health plans purchased by employers. In February 2014, the Company executed a managed care agreement with UHC. After executing the contract,

8

University General's UHC volume did not increase, contrary to the industry assumption that business would increase after going "in network." UHC business volume remained essentially unchanged in 2014 when compared with 2013.

24.     Although volume did not increase, University General's UHC reimbursement dramatically decreased in 2014. University General's estimated average UHC reimbursement decreased from $1.6 million per month prior to the execution of the contract to approximately $460,000 per month following the execution of the contract.

**D.     The Debtors' Business**

25.     As of the Petition Date, UGHS and its consolidated Debtor and non-Debtor subsidiaries together constitute a diversified multi-specialty healthcare provider that delivers physician and patient-oriented services. Together, UGHS and its consolidated subsidiaries operate, amongst others, a general acute care hospital, ambulatory surgical centers, hyperbaric wound care centers, diagnostic imaging centers, physical therapy centers, and senior living centers.

26.     The Company's corporate headquarters are in Houston, Texas. As of the Petition Date, the Debtors had approximately 740 employees. The employees perform a variety of critical functions, including but not limited to patient care, accounting, administrative support, accounts payable, billing operations, compliance (legal and regulatory), corporate development, housekeeping, human resources, information technology, and legal.

**E.     The Debtors' Corporate and Capital Structure**

27.     Debtor University General Health System, Inc. is the corporate parent and the direct or indirect parent of each of the other Debtors. A corporate organization chart depicting the Company's capital structure is attached hereto as Exhibit A.

28.    Certain Debtors are obligated on a Revolving Loan issued by MidCap Financial, LLC ("MidCap"). On September 28, 2012, UGHS Hospitals, Inc., University General Hospital, LP, and University Hospital Systems LLP, along with certain non-Debtor subsidiaries of UGHS (collectively the "MidCap Borrowers") entered into a Credit and Security Agreement with MidCap (the "MidCap Credit Agreement"). Pursuant to the agreement, MidCap issued a term loan of $4,000,000, which was repaid in 2013, along with a revolving loan (the "Revolving Loan Facility") in the amount of $15,000,000. The Revolving Loan is secured by the assets of the MidCap Borrowers. In connection with the financing, UGHS entered into the Pledge Agreement, dated September 28, 2012, with the Borrowers and MidCap, pursuant to which UGHS provided an unsecured guaranty for the principal and interest on the Borrowers' obligations to MidCap. Currently, approximately $14.7 million remains outstanding under the Revolving Loan Facility.

29.    In addition, UGHS provided an unsecured guarantee of the loans issued by FNB to Dufek in connection with the acquisition of the Company's Dallas Hospital.[4] To finance the purchase, UGHS Dallas entered into a loan agreement with First National Bank for a $28,500,000 credit facility (the "PlainsCapital Facility")[5], secured by a number of assets of UGHS Dallas and Dufek Massif, along with UGHS Dallas' stock in Dufek Massif. In connection with the purchase, UGHS entered into an unsecured Guaranty Agreement (the "2012 Guaranty") with First National Bank, pursuant to which UGHS provided an unsecured guaranty of UGHS Dallas' obligations to First National Bank. As of December 31, 2014, PNB asserted that $27.8

---

[4]    In December 2014, University General Health – Dallas closed, and it is no longer accepting patients. Dufek Massif Hospital Corporation is currently in receivership. A foreclosure sale is scheduled for March 3, 2015.

[5]    In September 2013, in connection with FDIC proceedings and pursuant to a purchase and assumption agreement with the FDIC, PlainsCapital Bank assumed substantially all of the liabilities and purchased substantially all of the assets of First National Bank.

million of principal amount plus interest remained outstanding under the PlainsCapital Facility. In addition, the Debtors have various other unsecured debts, including trade debt and outstanding payroll, sales, and franchise tax liabilities.

30.     As of the Petition Date, there were 405,029,678 shares of outstanding common stock in UGHS. As of the Petition Date, UGHS had issued 3,000 shares ($0.001 par value), of Series B preferred stock and had 3,000 shares outstanding. As of the Petition Date, UGHS had issued 7,616 ($0.001 par value), of Series C convertible preferred stock and had 3,044 shares outstanding. On February 20, 2015, the closing price of UGHS's stock was $0.01 per share. UGHS's stock is traded on the OTC Markets Group (OTC BB).

**F.     Events Leading to the Chapter 11 Filing**

31.     As losses mounted from the Dallas hospital, UGHS' financial conditions significantly worsened in 2014. Mike Griffin, then the chief financial officer of the Company, and exercising complete control over the Company's finances, began to manage liquidity by delaying payments to creditors and payments owed to the IRS and other taxing authorities for payroll taxes, franchise taxes, and sales taxes. As a result, most creditors demanded cash on delivery for critical goods and services and "catch-up payments," further limiting the Company's liquidity. Over the course of 2014 and 2015, total trade debt rose to over $20 million, and unpaid payroll taxes (including estimated penalties and interest) totaled over $12 million. By this time, the Company had determined that its financial and operational assumptions presented and acted upon by Mike Griffin were incorrect. To address this dire situation, the Company disposed of non-performing HOPDs in both Houston and Dallas. In addition, the Company undertook several measures in 2014: (1) the sale of its non-core senior living business, (2) the appointment of a new interim chief financial officer, Kris Trent, to oversee the financial function and manage liquidity for the Company, and (3) disposition and ultimate closure of the Dallas hospital.

11

Management's focus on the core assets connected to the Houston hospital operations led to record level services in December 2014.

<u>2014 Sale of Senior Living</u>

32.     The Company determined to dispose of assets that were not core to its hospital business. In May 2014, the Company engaged Dougherty & Company of Minneapolis to conduct a sale process of the Company's senior living business (i.e., UGHS Senior Living, Inc. and its subsidiaries). Following conclusion of the sale process, UGHS selected the transaction proposal submitted by Cornerstone Healthcare Group Holding, Inc. ("Cornerstone") and, on December 14, 2014, executed an asset purchase agreement with Cornerstone. Under the asset purchase agreement, Cornerstone agreed to acquire the Company's senior living business for a purchase price of approximately $30.0 million, including approximately $16.5 million of assumed liabilities. The closing is subject to certain closing conditions, including the approval of the U.S. Housing and Urban Development Department (which was received on February 25, 2015), which guarantees certain mortgages securing the indebtedness of UGHS Senior Living, Inc. and its subsidiaries.

33.     This transaction, which is expected to close in the near future, will both eliminate approximately $30.0 million of debt at the UGHS level as well as a pledge of UGHS's interest in two profitable non-Debtor owned ambulatory surgical centers in located in Houston.

<u>Kris Trent Appointed Interim CFO</u>

34.     In July 2014, Kris Trent was appointed Interim Chief Financing Officer of UGHS. In December 2014, Ms. Trent was appointed as Chief Financial Officer of UGHS. Mike Griffin, the Company former CFO, transferred to operate the Dallas hospital.

<u>Sale and Ultimate Closing of the Dallas Hospital</u>

12

35.     Facing mounting losses, in June 2014, the Company determined that the Dallas hospital needed a stronger financial and operational partner in order to continue operations. The Company conducted multiple discussions with a number of parties but were unable to find a buyer. In light of the severe liquidity drain on the Company's other business units including University General, the Company closed the Dallas hospital in December 2014. Prior to the closure, Mike Griffin resigned on November 14, 2014.

36.     As the Company was shutting down the Dallas hospital, collections from accounts receivable fell by more than 50% in December 2014. This was due, in large part, to the lack of a smooth transition and oversight of the Company's billing company, Autimis, following the departure in October 2014 of  Mike Griffin's sons—Brandon Griffin, Ryan Griffin and Jordan Griffin—who managed Autimis. Exacerbating this drop in collections, University General Hospital's December occupancy was at a record levels, further straining the Company's scarce liquidity.

37.     With the assistance of its restructuring professionals and others, the Company diagnosed the billing issues and began to resume collection activity. However, due to the lag in collections, catch up collections were not received until January and February. The Company's senior management was continuously engaged in calls with MidCap to fund operations as MidCap's collateral eroded. As a condition to funding the Company's critical liquidity needs, including the final payroll and payroll taxes for the terminated Dallas employees due on December 22, 2014, MidCap required that Hassan Chahadeh, Edward T. Laborde, Jr., and Ms. Trent sign personal guaranties that the Company would only pay items approved by MidCap and barred the Company from paying the fees of restructuring professionals. Due to the

13

lack of cash, UGHS's senior officers frequently paid for medical supplies and other key services to operate the hospital out of their own personal resources.

<u>Failed Pursuit of a Merger</u>

38.     Unable to hire restructuring advisors, in January 2015, the Company pursued multiple combination transactions with other health care systems. Ultimately, these transactions never materialized.

<u>Creditor Enforcement Actions</u>

39.     With scarce liquidity, mounting trade payables, and MidCap's unwillingness to allow the Company to pay restructuring professionals to prepare the Company to file for chapter 11 protection, a number of creditors began to enforce their rights against the Company. On January 28, 2015, PNC obtained an order placing the Dallas hospital into receivership. On February 5, 2015, personnel from the Harris Count sheriff's department, arriving in seven police cars and a moving van, entered the Houston hospital to execute judgments on behalf of four judgment creditors. The sheriff seized stock certificates but did not remove any equipment after the Company presented the sheriff with evidence of MidCap's security interest in equipment. That same day, the Company's account with Chase Bank containing approximately $300,000 was garnished. In February, 2015, two applications for the appointment of a state court receiver were filed by two different creditors.

40.     On February 19, 2015, the Company received notice of a pending termination of its lease of the Houston hospital.

41.     On February 20, 2015, MidCap removed the prohibition under the forbearance agreements on paying for restructuring professionals under certain limitations.

42.     On February 27, 2015 these chapter 11 cases were commenced.

14

<u>Reorganization Goals</u>

43.     By commencing these chapter 11 cases, the Debtors seek to preserve the estates by protecting their assets from enforcement actions of their creditors, provide a platform for obtaining necessary liquidity to restructure its business and return to profitability, and maximize value for the estates and their stakeholders.

## PART II.

## FIRST DAY PLEADINGS

44.     The Debtors expect to file the First Day Pleadings,[6] and respectfully request that the Court consider entering the proposed orders granting such First Day Pleadings. I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

**A.      Administrative and Procedural Matters**

1.     The Debtors have filed or file will two "administrative" pleadings that seek to (1) jointly administer the Debtors' Chapter 11 Cases for procedural purposes only and (2) to retain UpShot Services LLC ("<u>Claims Agent</u>") as claims and noticing agent. The Debtors' attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

<u>Joint Administration</u>

---

[6]     Any term not defined herein has the meaning ascribed to it in the specific First Day Pleading being described.

2.      The Debtors are requesting that their chapter 11 cases be jointly administered, for procedural purposes only. As set forth above, UGHS is the direct or indirect parent of each of the other Debtors. As such, I believe that all of the Debtors are "affiliates," as that term is defined in Bankruptcy Code section 101(2) and as used in Local Bankruptcy Rule 1015(b).

3.      I believe that joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, and related notices, that otherwise would need to be filed in each separate case absent joint administration. Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files, and will ease the burden on the office of the U.S. Trustee in supervising these cases. Accordingly, I believe that joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the U.S. Trustee and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates. Furthermore, I believe that the rights of the creditors of each of the Debtors will not be adversely affected by joint administration of the Chapter 11 Cases inasmuch as the relief sought is purely procedural and is not intended to affect substantive rights.

<u>Application to Appoint UpShot Services, LLC as Claims and Noticing Agent</u>

4.      It is my understanding that the Debtors are applying (the "<u>Section 156(c) Application</u>") for entry of an order appointing UpShot Services, LLC ("UpShot") as claims and noticing agent in these Chapter 11 Cases. I believe that such relief is prudent in light of the thousands of creditors, potential creditors and parties in interest to whom certain notices will be sent.

16

5.      I believe that UpShot's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and of other developments in the Chapter 11 Cases. Moreover, I am informed that UpShot has acted as the claims and noticing agent in numerous cases of comparable size. Moreover, the Debtors obtained and reviewed engagement proposals from two (2) other Court-approved claims and noticing agents to ensure selection through a competitive process.

6.      As more fully detailed in the Section 156(c) Application, I understand that UpShot will engage in certain Claims and Noticing Services, including, but not limited to, transmitting, receiving, docketing and maintaining proofs of claim filed in connection with the Chapter 11 Cases. UpShot will also work with the office of the Clerk of the United States Bankruptcy Court for the Southern District of Texas to ensure that its methodology conforms with all of the Court's procedures, the Local Bankruptcy Rules and the provisions of any order entered by this Court.[7]

7.      Accordingly, I believe that retention of UpShot, an independent third party with significant experience in this role, to act as an agent of the Court, is in the best interests of the Debtors and their estates and creditors.

**B.      Motion to Continue Cash Management System**

8.      <u>Cash Management</u>. The Debtors have filed a motion to continue their ordinary course banking practices. I understand that the Debtors maintain a cash management system, comprised of fourteen (14) bank accounts (the "<u>Bank Accounts</u>"), that facilitates the efficient flow and management of funds involved in the Debtors' operations (the "<u>Cash Management System</u>"). The Debtors routinely deposit, withdraw and otherwise transfer money

---

[7]     The Debtors also intend to file an application to retain UpShot to perform certain administrative services pursuant to Bankruptcy Code section 327.

4820120v2

to, from and between the Bank Accounts by various methods. I believe that the Cash

Management System is essential to enable the Debtors to control and monitor funds, ensure cash

availability and liquidity, comply with the requirements of their financing arrangements, and

reduce administrative expenses by facilitating the movement of funds and enhancing the

development of accurate account balance information.

        9.     Receipts. The Debtors' cash receipts, which derive primarily from

payments from Medicare, Medicaid, and commercial insurance, flow directly to a lockbox in a

depository account maintained by University General Hospital, LP at Amegy Bank (the

"Receipts Account"). The Receipts Account is controlled by MidCap Financial pursuant to a

deposit account control agreement ("DACA"). MidCap Financial regularly withdraws the funds

from the Receipts Account and deposits them in a Wells Fargo Bank account controlled by

MidCap Financial (the "Payment Account"). MidCap Financial retains either 5% (in weeks when

non-management payroll is due) or 10% (in all other weeks) of receipts and transfers the

residual, on a daily basis, to a day-to-day operating account maintained by University General

Hospital, LP at Chase Bank (the "Operating Account").

        10.    The Debtors' other cash receipts, including for merchant payments, credit

card payments, patient self-pay, and compensation received from third-party clients for support

services provided, are generally received into the Operating Account or into the accounts

maintained by UGHS Autimis Billing, Inc. (Chase Bank Acct. # XXXXX-8865), UGHS Autimis

Coding, Inc. (Chase Bank Acct. # XXXXX-8790), Sybaris Group Inc. (Memorial City Bank

Acct. # XX-9159), and UGHS ER Services, Inc. (Chase Bank Acct. # XXXXX-1262). Those

funds are regularly wired to MidCap Financial's Wells Fargo account. MidCap Financial retains

4820120v2

either 5% or 10% of receipts and transfers the residual from these payments into the Operating Account.

11.     Disbursements. The Operating Account directly disburses funds for various purposes, including payroll, payroll taxes and employee benefits for non-management employees, as well as general corporate expenses for University General Hospital, LP.

12.     In addition, the Debtors fund their other disbursement accounts, described as follows, from the Operating Account on an as-needed basis. University General Hospital, LP maintains a checking account at Chase Bank (Acct. # XXXXX-7132, the "Accounts Payable Account"), which is used to pay accounts payable of University General Hospital, LP. UGHS Autimis Billing, Inc. (Chase Bank Acct. # XXXXX-8865) and UGHS Autimis Coding, Inc. (Chase Bank Acct. # XXXXX-8790) maintain checking accounts that are used for payroll and payroll tax costs of these Debtors. Additionally, the UGHS Billing, Inc. checking account is utilized for disbursements to vendors of UGHS Autimis Billing, Inc. and UGHS Autimis Coding, Inc.  Sybaris Group, Inc. (Memorial City Bank Acct. # XX-9159) maintains a checking account that is used to make payroll disbursements and disbursements to vendors of Sybaris Group, Inc. UGHS Management Services, Inc. (Chase Bank Acct. XXXX-7750) maintains a checking account that is used to makes payroll and payroll tax distributions and employee expense reimbursements for management employees. University General Hospital, LP maintains a tax depository account at Chase Bank (Acct. # XXXXX-0457, the "Tax Deposit Account"). The Tax Deposit Account is used to make payroll tax payments to the IRS.

13.     Additional Accounts. In addition to the accounts described above, University General Hospital, LP  maintains a savings account at Chase Bank (Acct. # XXX-

19

XXX-0902) (the "<u>Savings Account</u>"). As of the Petition Date, the Savings Account is not utilized.

            14.    <u>Intercompany Transactions</u>. In the ordinary course of business, University General Hospital, LP transfers money to various entities of University General Health System, Inc. ("UGHS") from the Operating Account (the "<u>Intercompany Transactions</u>"). Although the Intercompany Transactions involve the transfer of funds between bank accounts owned by University General Hospital, LP and bank accounts owned by various UGHS entities, including UGHS Autimis Billing, Inc., UGHS Coding, Inc., UGHS ER Services, and UGHS Management Services, Inc., because the Company operates on a consolidated basis, the Company maintains its books and records on a consolidated basis.  Failure to continue the Intercompany Transactions in the ordinary course of the Debtors' business would unnecessarily and severely hinder operations. Intercompany Transactions are integral to payroll funding. Accordingly, I strongly believe that absent the continuation of the Intercompany Transactions, the health and safety of the Debtors' patients would be jeopardized, the Debtors' ability to operate their primary business during the Chapter 11 Cases would be severely prejudiced, and their ability to maximize value for creditors would be drastically reduced. Avoiding such potentially crippling hindrances by continuing the Intercompany Transactions is, therefore, in the best interests of the estates.

            15.    <u>Business Forms</u>. In the ordinary course of business, the Debtors use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "<u>Business Forms</u>"). Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Requiring the Debtors to modify the Business Forms would

unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

16.     Waiver of Investment and Deposit Requirements.  I am advised by counsel that section 345 of the Bankruptcy Code establishes certain investment and deposit restrictions. I believe that the Debtors' cash investment practices substantially conform with the approved investment and deposit practices identified in section 345 of the Bankruptcy Code, and that all money deposits are safe and prudent and yield, under the circumstances, the maximum reasonable net return on such money. Nonetheless, out of an abundance of caution, to the extent that such deposits do not conform to the approved practices identified in section 345 of the Bankruptcy Code, the Debtors seek to have such requirements waived so as to allow the Company's Banks to accept and hold such funds in accordance with the Debtors' prepetition practices. In my opinion, a waiver of the section 345 requirements is in the best interests of the estates, all creditors and other parties in interest.

17.     It is my understanding that requiring the Debtors to alter their Cash Management System would jeopardize the health and safety of their patients and impair the Debtors' estates and disrupt their efforts to reorganize and pursue other alternatives to maximize value of their estates. Consequently, I believe that maintenance of the Cash Management System and the Debtors' other business and banking practices, as requested in certain of the First Day Pleadings, during the duration of the Chapter 11 Cases, is in the best interest of all creditors and other parties in interest.

**C.     Payment of Employee and Payroll Obligations**

18.     As of February 26, 2015, the Debtors employed approximately 740 Employees. Of these, 560 are salaried management Employees and 180 are hourly or salaried non-management Employees. The Employees perform a variety of critical functions, including

but not limited to accounting, administrative support, accounts payable, billing operations, compliance (legal and regulatory), corporate development, housekeeping, human resources, information technology, legal, and patient care. Retaining the Employees, whose skills and understanding of the Debtors' operations and infrastructure are essential to the effective operation of the Debtors' businesses, is critical to the Debtors' ability to operate and maximize value in these Chapter 11 Cases.

19.     <u>Wages and Salaries</u>.  Certain Employees are paid bi-weekly, and others are paid bi-weekly but on alternating weeks from the other Employees, such that a payroll distribution is scheduled for every Friday. Other Debtors pay employees on the first and fifteenth of each month, fifteen days in arrears. As such, on February 20, 2015, the Debtors made their most recent payroll for certain Employees.  On the Petition Date, the Debtors have an obligation to fund payroll for other Employees.  The Debtors are filing an *ex parte* motion, with the consent of MidCap, seeking authority to use cash collateral to immediately fund this payroll obligation. The Debtors seek authority, but not direction, to pay and/or otherwise honor (during the Interim Period) in the ordinary course of business the amounts owed as of the Petition Date for accrued and unpaid wages and salaries up to the Priority Cap and any current amounts that the Debtors are required by law to withhold from Employee payroll disbursements in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes.  The Debtors seek authority, but not direction, to pay all such amounts pursuant to the Final Order.

20.     <u>Other Employee Compensation: Paid Time Off and Expense Reimbursement</u>. The Debtors also offer their Employees other forms of compensation, including paid time off and reimbursement of certain business expenses. The Debtors' Paid Time Off policies include holidays, vacation pay, and sick days.  Additionally, the Debtors routinely

reimburse Employees or pay credit card invoices on behalf of Employees for certain reasonable expenses incurred within the scope of their employment. The Debtors believe that no current Employees have outstanding Reimbursable Expenses. However, out of an abundance of caution and to avoid harm to the Employees, the Debtors seek authority, but not direction, to pay all outstanding prepetition Reimbursable Expenses. In addition, in order to avoid harm to the Employees, the Debtors seek authority, but not direction, to continue their expense reimbursement policy during and after the Interim Period in the ordinary course of business and subject to the Debtors' discretion and applicable restrictions under the Debtors' policies; provided, however, that no Employee will receive payment in excess of the $12,475 Priority Cap on account of Prepetition Employee Obligations, including Reimbursable Expenses, during the Interim Period.

21.     Medical and Insurance Benefit Plans.  In the ordinary course of business, the Debtors have established various standard and customary plans and policies to provide their Employees with (a) medical and prescription drug plans (the "Health Insurance Benefits"), and (b) additional insurance benefits (together with the Health Insurance Benefits, the "Medical and Insurance Benefits").

22.     Health Insurance Benefits. The Debtors offer medical plans and prescription drug plans that are administered by Humana. The Debtors pay an average of approximately $318,831 per month to Humana for administering the plans. Due to a lag in the processing of claims, certain amounts may be accrued but not outstanding on account of the Health Insurance Benefits. Such amounts are difficult to estimate at this time. The Debtors therefore request authority, but not direction, to pay benefits and administrative costs under the

23

Health Insurance Benefits plans, and to continue their practices related to this plan during and after the Interim Period in the ordinary course of business.

23. <u>Life Insurance Benefits</u>. The Debtors provide or offer Employees life insurance plans, which are provided at the expense of the Debtors as a benefit to eligible Employees. Insurance under the Debtors' life insurance plan is provided by Lincoln Financial ("<u>Lincoln</u>"). On average, the Debtors pay approximately $27,813 per month to Lincoln on account of the life insurance plan. As of the Petition Date, the Debtors estimate that $1,819 is due to Lincoln on account of the life insurance plan. The Debtors request authority, but not direction, to pay benefits and administrative costs under the life insurance plan, and to continue to pay for their policies and continue their practices related to these plans during and after the Interim Period in the ordinary course of business.

24. <u>Optional Insurance Benefits</u>. The Debtors also make available to Employees, at the Employees' expense, certain additional insurance coverage. Such optional coverage includes supplemental life insurance, also provided by Lincoln, dental insurance provided by MetLife, and vision insurance provided by EyeMed (collectively with the Optional Life Insurance Plan, the "<u>Optional Plans</u>"). The Optional Plans are fully funded by Employees. The Debtors hereby request authority, but not direction, to continue the Optional Plans during and after the Interim Period in the ordinary course of business and, to the extent that the Debtors hold funds representing premiums withheld from Employees' paychecks in connection with the Optional Plans, to remit such funds to the appropriate providers during and after the Interim Period in the ordinary course of business.

25. <u>Other Benefit Plans and Programs</u>. The Debtors also maintain a 401(k) savings plan for its Employees (the "<u>Savings Plan</u>") administered by Principal Financial Group

24

and available to non-management employees. Under the Savings Plan, eligible Employees may elect to contribute up to the annual IRS dollar limit (which varies annually) to the Savings Plan, and the Debtors match 25% of each Employee's contribution up to a maximum of 3% of each Employee's gross earnings per year. The Debtors request authority, but not direction, to continue the Savings Plan and to pay any outstanding accrued obligations related to the Savings Plan during and after the Interim Period in the ordinary course of business.

26.     The Debtors also provide a tuition reimbursement benefit to Employees (the "Tuition Reimbursement Program"). Eligible Employees may be reimbursed for tuition in approved coursework, up to a maximum of $2,000 per non-management Employee per year and $6,000 for management-level Employees for job-related coursework. As of the Petition Date, approximately 10 Employees are participating in the Tuition Reimbursement Program. The Debtors estimate that, as of the Petition Date, approximately $17,200 is accrued but not outstanding on account of the Tuition Reimbursement Program.  The Debtors request authority, but not direction, to continue the Tuition Reimbursement Program in their sole discretion and to make payments pursuant to the Tuition Reimbursement Program during and after the Interim Period in the ordinary course.

27.     Direction to Banks.  Finally, the Debtors seek an order authorizing and directing the financial institutions upon which any checks, drafts, electronic funds transfers, or wire transfers are drawn in payment of the Prepetition Employee Obligations – either before, on, or after the Petition Date – to honor all such checks or drafts issued, upon presentation thereof, or all such wire transfer instructions, upon receipt thereof, provided that sufficient funds are immediately available and on deposit in the applicable accounts.  The Debtors also seek an order authorizing them to issue new postpetition checks or effect new postpetition fund transfers on

25

account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.  The Debtors also request that any party receiving payment from the Debtors be authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by the requested relief.

28.    I believe the Debtors' ability to maximize value depends, in large part, upon the motivation of the Employees.  Most of the Debtors' Employees (and their families) are dependent upon the wages, salaries, reimbursements and other benefits they receive from the Debtors.  Any disruption from Employee resignations or lack of morale could have devastating effects not only on the Debtors' ongoing operations and restructuring efforts but also on the health and safety of the Debtors' patients.  Accordingly, I believe it is critical that the Debtors be authorized to honor their Prepetition Employee Obligations during and after the Interim Period, subject to the limitations described in the Motion.

4820120v2

      I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: Houston, Texas
        February 27, 2015

                    By:    _____
                    Name:    Edward T. Laborde, Jr.

**EXHIBIT A**

**Corporate Organizational Chart**



1019207/CHI2A